# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

---

HRH, LLC, a *Wyoming limited liability company*,

          Plaintiff,

     vs.

TETON COUNTY, WYOMING, *a political subdivision of the state of Wyoming, et al.*,

          Defendants.

Case No.  18-CV-104-SWS

---

## ORDER ON BENCH TRIAL

---

This matter comes before the Court on a bench trial conducted June 21 through June 29, 2021, in Jackson, Wyoming. The parties have presented their evidence, fully briefed the issues and submitted thorough proposed findings of fact and conclusions of law. (*See* ECF Nos. 188, 193.) Having reviewed the evidence and arguments presented by the parties, the Court finds and orders as follows.

## BACKGROUND

In 2020 the overall median price for residential sales (including single family homes, condominiums, townhouses and undeveloped land) in Teton County, Wyoming was $1.59 million, representing a 45 percent increase from 2019.[1] The mean/average price

---

[1] The Implications of Jackson Hole's 2020 Real Estate Market, Jonathan Schechter, February 2021. https://cothrive.earth/the-implications-of-jackson-holes-2020-real-estate-market/

was $2.54 million, a 53 percent increase. *Id*. It is an understatement to say homes and land in Teton County Wyoming are valuable, let alone undeveloped land. Thus, the catalyst for the issues presented in this case.

This case involves a three-year-long dispute concerning an alleged improper interference with the purchase and proposed land development of real estate in Teton County, Wyoming. After passage of time, various dismissals of claims, and dismissals of parties for various reasons including partial settlement, one claim remained before this Court on a bench trial for tortious interference with a contract/prospective economic advantage against Alliance Route of 390 Neighbors ("the Alliance"), James M. Speyer, Gerald J. Kitchen, and Diana Kitchen ("the Kitchens"). The morning of closing arguments, counsel for HRH indicated HRH had settled the matter with Defendant James M. Speyer. Mr. Speyer's counsel confirmed the parties' resolution on the matter. (*See* ECF No. 200.) Accordingly, the sole remaining claim left for this Court to determine endures only against the Alliance and Mr. and Mrs. Kitchen ("the Defendants").

### APPLICABLE LAW

Following a bench trial, the Court must separately issue findings of fact and conclusions of law. Fed. R. Civ. P. 52(a). The Court may do so orally at the conclusion of evidence or in a subsequent opinion or memorandum of decision. *Id*. The Court's findings of fact should be sufficient to indicate the factual basis for its conclusion, indicate the legal standards against which the evidence was measured, and be broad enough to cover all material issues. *Otero v. Mesa Cnty. Valley Sch. Dist*, 568 F.2d 1312, 1316 (10th Cir.

1977). At the same time, however, the Court does not need to make "inordinately detailed findings." *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 877 (10th Cir. 1984).

**FINDINGS OF FACT**

After considering the testimony and exhibits admitted at trial, the Court makes the following Findings of Fact in accordance with Rule 52 of the Federal Rules of Civil Procedure.

**The Parties**

HRH, LLC ("HRH") is a Wyoming limited liability company. Steve Hancock and Tom Reynolds are the sole members of HRH. (Exhibit A-1). The Alliance is a Wyoming unincorporated nonprofit association formed by a group of Teton County landowners in November of 2015, comprised of approximately two hundred members. (Exhibit I-9) Defendants Gerald J. Kitchen and Diana Kitchen are members of the Alliance. Former Defendants Richard D. Jaquith, Patricia P. Jaquith, and James M. Speyer are also members of the Alliance, but have been dismissed from this case upon notice of settlement. (*See* Joint Stipulated Facts, ECF No. 153, *see also* ECF Nos. 162, 200.)

**Bar J Option Property and Agreement**

On April 19, 2015, HRH entered into a written option agreement with Humphrey, LLC, which provided HRH the right to purchase 21.2 acres of land on Wyoming Highway 390 in Teton County, Wyoming, known as "the Bar J Property." Babe Humphrey owned and operated the Bar J Ranch and, therefore, executed the option agreement on behalf of Humphrey, LLC. Mr. Humphrey was approached by Mr. Hancock and Mr. Reynolds in early 2015 about selling the Bar J Property and having it developed.  The 2015 Bar J Option

Page **3** of **51**

Agreement required HRH to pay for the cost of obtaining entitlements for redevelopment of the property, but the agreement did not require any consideration for the option to purchase, nor did it require HRH to obtain entitlements at all. (*See* Ex. 4.) The Bar J Property operated as the Bar J Chuckwagon dinner theater in Teton County, Wyoming for 44 years. It is one of only a handful of "special projects" recognized under Teton County's Comprehensive Plan and Land Development Regulations, subject to a "Master Plan" approved by Teton County in 1977.

HRH's original 2015 Bar J Option Agreement was set to expire May 1, 2016. (Ex. 4.) On April 29, 2016, HRH and Mr. Humphrey executed an "Amended and Restated Option to Purchase Agreement" ("2016 Bar J Option Agreement"). The 2016 Bar J Option Agreement extended HRH's option to December 31, 2016. On February 2, 2017, HRH and Mr. Humphrey agreed in writing to extend HRH's option period for a second time under the 2016 Bar J Option Agreement to September 30, 2017 ("2017 Extension Agreement"). (Ex. 5.) This extension had an effective date of December 31, 2016. (*See* Joint Stipulated Facts, ECF No. 153, *id.*) The 2017 Extension Agreement expressly stated that the purpose of the extension was "to allow for the achieving of necessary development approvals as required by the contemplated development of the property by HRH . . ." (*See* Ex. 5 at 1.) Mr. Humphrey testified that Hancock and Reynolds didn't have any money so the price for the property under the option was increased.

**HRH's Organization and Preliminary Efforts to Develop the Bar J Property**

In pursuit of the venture to purchase the Bar J Property, Mr. Hancock organized HRH, LLC, filing Articles of Organization with the Wyoming Secretary of State on February 11, 2015. (Ex. A-1.) Mr. Reynolds and Mr. Hancock testified, despite having three initials, HRH has never had any other members. Mr. Hancock is a realtor with considerable experience in buying and selling real estate in Teton County, but had limited experience as a commercial real estate developer. In 2015 and thereafter, his personal financial condition was at best poor, having various creditors with outstanding judgments against him. (*See* Exs. B-1, B-2, B-3.) Mr. Reynolds has no real estate development experience. Despite their lack of real estate development experience, Mr. Hancock and Mr. Reynolds combined and contributed their sweat equity and strategizing to pursue development of the Bar J Property.

Neither Mr. Hancock nor Mr. Reynolds made any capital contributions to HRH. To fund the cost of preparing plans and pursuing the Bar J Property purchase and development, HRH entered into an agreement to borrow $400,000 on the terms that the lenders/investors would receive threefold return if the project was approved, and the developed parcels sold. (Ex. A-14.) As was testified to by Nannette Hinkley, if the project was never approved, and thus, never developed, the lenders/investors would receive nothing. (*Id*. at 2; *see also* Exhibit  Z-2.1, Nannette Beckley depo transcript at 220-28).

In September 2013, Mr. Hancock hired professional land use planner, Scott Pierson, to design and seek approval for the Bar J project development. Mr. Pierson continued to serve in that role until HRH abandoned its development plans in the fall of 2017.

After signing the initial 2015 Bar J Option Agreement, Mr. Hancock testified HRH investigated development of the Bar J Property through the acquisition of unused development rights from the Teton Pines Limited Liability Company ("Teton Pines"), intending to incorporate the Bar J Property into the adjoining Teton Pines planned unit development ("PUD"). A PUD zone is intended to permit "variation from the strict application of the zones in order to achieve specific community goals that enhance the community's implementation of the Jackson/Teton County Comprehensive Plan." (Ex. C-19 at 7.)

On June 30, 2015, HRH submitted a Zoning Compliance Verification ("ZCV") application to Teton County for a determination of whether there were unused development rights for Teton Pines. (Ex. D-3 at 14.) The County responded on August 14, 2015 with the requested documentation, providing information about the Bar J Property including its allowed use and development potential. (*Id*. at 1-5.) Mr. Hancock testified on cross-examination, that the County informed him the Teton Pines' unused development rights would not be a feasible option for development of the Bar J Property. After receiving this information, HRH altered its development strategy. Instead of pursuing unused development rights pertaining to Teton Pines, HRH determined instead to amend the Bar J Master Plan to facilitate its intended development proposal.

The Bar J Master Plan was first approved in 1977. (Ex. D-2). The plan developed slowly over the following forty years to meet the growing needs of the Bar J Chuckwagon operation, which offers seasonal dinner theater shows throughout the summer months. The Bar J Chuckwagon is considered a commercial use on the Moose Wilson Road next to

Teton Pines County Club. The Bar J is one of only seven permitted master plans or special projects existing in Teton County. (Ex. C-19 at 2.)

The 2015 Land Development Regulations ("LDRs") provided in Section 8.2.13.D that any amendment to a master plan "shall . . . [c]omply with the requirements of the underlying base zoning to the maximum extent practicable." (*See id*. at 12.) The underlying zoning of the 21.2-acre Bar J Property was classified as Neighborhood Conservation ("NC") which restricts residential development to one residence per three acres. HRH never sought to rezone or apply to change the Bar J Property's underlying zoning. Additionally, a small portion of the Bar J Property was situated within the Natural Resources Overlay ("NRO"). (Ex. D-3 at 1.)

On April 1, 2016, HRH met with Teton County for a pre-application conference on the subject of its intended forthcoming application to amend the Bar J Master Plan. Following that meeting, Teton County's Principal Planner, Roby Hurley, sent an email to those attending the meeting ("pre-application conference summary"). (*See* Joint Stipulated Facts, ECF No. 153, *see also* Ex. 23.) The email included a statement that "a master plan amendment would take Bar J out of the Specially Named Project Section 1.8.2.C.3 and would become a PUD under Section 1.8.2.C.1." (Ex. 23 at 1.)

**The First Appeal**

In the fall of 2015, residents who lived primarily on the Teton Pines Country Club property which adjoins the Bar J Property, began expressing concerns about the rumors of the sale and redevelopment of the property. (*See* Ex. H-5.) Joining in their concern, the residents formed "The Alliance of Route 390 Neighbors" to better understand the

development process. (*See* Ex. I-9 and I-12.) The Alliance also sought professionals to advise them regarding HRH's proposed development of the Bar J Property. They ultimately hired legal counsel, Matt Kim-Miller of Holland & Hart, LLP, and Bill Collins, a former Teton County Planning director and author of the LDR sections related to special projects in Teton County. (*Id.*) At all relevant times, the Defendants relied on legal counsel and Mr. Collins to explain the LDRs and the manner in which the Bar J Property might be lawfully developed. The Defendants learned from Mr. Collins (Ex. 24) that PUDs were expressly prohibited under the 2015 amendment to the LDRs. Mr. Matt Kim-Miller agreed and conveyed this to the Teton County Attorney. (Ex. K-11). This meant that the County's email concerning the pre-application conference summary, which indicated the Bar J Property would become a PUD, contradicted the LDRs.

Shortly after HRH received the pre-application conference summary from the County concerning its intended application to amend the Bar J Master Plan, on May 2, 2016, the Alliance filed an appeal ("the first appeal") under Teton County LDR 8.8.3 of Teton County's April 1, 2016 pre-application conference summary. (Ex. 43.) The first appeal took issue with the Teton County Planning Director's interpretation of the LDRs contained in the pre-application conference summary issued on April 1, 2016. Specifically, the Alliance disagreed with the County's assessment that the LDRs provided that an amendment to the Bar J Master Plan would transform the master plan into a PUD. (*Id.* at 3; see also Ex. K-11.) Conversely, the Alliance argued, once the Bar J terminated its traditional chuckwagon use permitted by the special project, the master plan could not be amended or transformed into a PUD, as no new PUDs were permitted in the County under

the current LDRs. (Ex. 43 at 6 fn. 2). Thus, the Alliance believed, once the Bar J Property's special use was abandoned—in other words, once it was sold for development—the LDRs mandated the property would revert back to its underlying zoning, NC, which only allowed for seven units on the property. *Id*.

The basis the Alliance relied on for its first appeal was LDR 8.3.3.A, which at the time, allowed an "aggrieved person affected by any decision or interpretation by the Planning Director or County Engineer to appeal the decision or interpretation to the Board of County Commissions for a review of whether the decision or interpretation complies with the requirements of [the] LDRs." (Ex. C-19 at 30.) Similarly, LDR 8.3.3.B provided that an "appeal may be filed for any decision or interpretation of the Planning Director or County Engineer" and that the appealed decision "must be formally documented." (*Id*.) Relying on those LDRs, Mr. Kim-Miller, counsel for the Alliance, advised the Alliance that any representation by the County that the Bar J Property could be developed as a PUD was legally unsupportable and encouraged them to file an appeal. Mr. Kim-Miller also communicated these concerns directly to the County prior to filing the first appeal. (*See* Exs. K-11, K-12.)

After Teton County received the first appeal, acting through its Planning Director, Tyler Sinclair, the County applied an automatic stay pursuant to LDR 8.8.3.C, which provided, "[a]n appeal shall stay all further action related to the subject of the appeal, unless a stay would cause imminent peril to life or land." (*Id*., *see also* Ex. 26. ) On May 23, 2016, Teton County filed a motion to dismiss the first appeal. (Ex. 44.) HRH intervened in the first appeal and, on July 14, 2016, filed a motion seeking to have Teton County lift the

automatic stay it had imposed under LDR 8.8.3.C. (*See* Joint Stipulated Facts, ECF No. 153 at 2.)

On July 25, 2016, the parties filed a Stipulated Motion to Dismiss the first appeal, signed by attorneys of the Alliance, Teton County, HRH, and Teton County's Hearing Officer, Andrew Salter, who recommended the Teton County Board of County Commissioners order dismissal. (Ex. L-18.) The stipulation provided that Teton County Planning Director would amend portions of the pre-application conference summary and reissue the pre-application summary form, both to remove any references to the Bar J Property becoming a PUD and to acknowledge the underlying zoning as NC. (*See id*., *see also* Ex. H-24.)

On August 2, 2016, the Teton County Board of County Commissioners (the "Board") issued its order of dismissal of the first appeal based on the parties' stipulation. (*See* Joint Stipulated Facts, ECF No. 153 at 3.) The same day, the County lifted the automatic stay. Due to the parties' settlement of the matter, the County did not issue any recommendations concerning the merits of the first appeal.

**HRH's Application to Amend the Bar J Master Plan**

Despite effort to avoid the costs and delay, HRH learned in February of 2016 that it would need to conduct an Environmental Assessment ("EA") of the Bar J Property prior to filing any application to amend the Bar J Master Plan. (Ex. E-62 at 2.) HRH conducted the EA later in 2016 and submitted it on February 24, 2017. (*See* Ex. N-4.) On February 28, 2017, Mr. Hurley issued a letter in connection with HRH's EA, which notified HRH, in contravention with the parties' prior settlement, that HRH was "free to apply for a

Planned Unit Development"—a PUD permit. (*See id*.) HRH filed its application to amend the Bar J Master Plan with the County on March 2, 2017. (Ex. 52 and M-4.)

At this time, HRH had entered into its 2017 Extension Agreement with Mr. Humphrey, extending its option to purchase for $16,000,000 until September 30, 2017, effective on December 31, 2016. (*See* Ex. 5.) The Alliance became aware of HRH's application to amend the Bar J Master Plan on or about March 2, 2017 and obtained a copy of the application around the same time. The plan under HRH's application was for development of 46 free-market townhouse units and 23 affordable-living condominiums for a total of 69 residences on the former Bar J Property. This proposed development reflected a nearly ten-fold increase in density beyond the seven homes permitted according to the property's underlying NC zoning base. The 23 affordable units were proposed as required by the LDRs to meet the 25% allocation of the total population generated by new development at that time.

Teton County identified HRH's application for an amendment to the Bar J Master Plan as PUD2017-0002 and Sketch Plan, SKC2017-0003. (*See* Joint Stipulated Facts, ECF No. 153 at 3.) Teton County identified the EA as EVA2016-0008. In a letter dated March 3, 2017, Mr. Hurley, Principal Planner for Teton County in the Planning & Development Department, deemed EVA2016-0008 sufficient under LDR 8.2.5. (Ex. 28.) On March 16, 2017, Mr. Hurley deemed PUD2017-0002 and Sketch Plan, SKC2017-0003 sufficient under the LDRs. (Ex. 29.) Mr. Hurley's two letters shall be hereinafter referred to as "the sufficiency determinations." At the time he wrote and sent the sufficiency determinations,

Mr. Hurley was the Principal Planner for Teton County and Mr. Sinclair was the Planning Director.

**The Second Appeal**

On March 30, 2017, the Alliance[2] filed an appeal ("the second appeal") of the sufficiency determinations of the EA (EVA2016-0008) and the application for an amendment to the Bar J Master Plan (PUD2017-0002) and Sketch Plan (SKC2017-0003). (Ex. 30.) The second appeal challenged the County's sufficiency determinations pertaining to HRH's application to amend the Bar J Master Plan and the corresponding EA. (*See id*.) Specifically, the Alliance argued the sufficiency determinations corresponding to both the application to amend and the EA did not properly evaluate, apply, or interpret the correct LDRs, thereby rendering erroneous interpretations of LDR standards. (*Id*. at 7-14.) Ultimately, the Alliance argued, the application to amend the Bar J Master Plan did not comply with any applicable LDR which governed the development of the proposal, asserting the application "seeks development that is so far beyond the realm of possible or plausible under the provisions of the LDRs, that the Application cannot be deemed 'sufficient.'" (*Id*. at 14.) The second appeal also challenged the County's finding in the EA sufficiency determination that the Bar J Property was *not* within the NRO, which conflicted with the County's August 14, 2015 response to HRH's ZCV request that stated a portion

---

[2] Mr. and Mrs. Jaquith and Mr. Speyer also signed on as individual parties to the second appeal alongside the Alliance. (*See* Ex. 30 at 2). Both the Jaquiths and Mr. Speyer have been dismissed from the suit upon notice of settlement (*see* ECF Nos. 150, 162, 200), so for purposes of this Order, the discussion of the second appeal will only concern the Alliance.

of the Bar J Property *was* within the NRO. (*Id*. at 9; s*ee also* Ex. D-3 at 1.) (emphases added).

On April 11, 2017, Teton County and the Alliance stipulated that HRH could intervene in the second appeal and, on the same day, the Board granted HRH permission to intervene. (*See* Joint Stipulated Facts, ECF No. 153 at 3.) On May 1, 2017, Teton County and HRH each filed a motion to dismiss the second appeal. (Exs. 47-48.) The Alliance received and read HRH's and Teton County's motions to dismiss the second appeal.

On June 27, 2017, after receiving the recommendations of the appointed hearing officer, the Board granted the motions to dismiss of Teton County and HRH, dismissing the second appeal. (Ex. 31.) In its order dismissing the second appeal, the Board found, as a matter of law, the Defendants had no right to appeal the sufficiency determinations, as there were "no final decisions, binding interpretations, or agency actions associated with either of the two sufficiency determination letters." (Ex. 31 at 16.) The Board also found the Defendants were not aggrieved parties and lacked standing to appeal the sufficiency determinations. (*Id*. at 16-18.). Based upon these findings, the Board dismissed the second appeal under Wyoming Rules of Civil Procedure 12(b)(1) and 12(b)(6), for failure to state a claim upon which relief can be granted. The Alliance received and read the Board's order granting the motions to dismiss. The Alliance did not appeal the Board's dismissal of the second appeal to the Teton County District Court.

**The Third Appeal**

On March 15, 2017, prior to the Alliance's filing of the second appeal, the Alliance and the Kitchens submitted a written request to Teton County seeking a ZCV and/or a

formal interpretation of the LDRs as they related to the Bar J Master Plan ("the letter requests"). (*See* Joint Stipulated Facts, ECF No. 153 at 3-4, *see also* Exs. 54, K-60.) Nine days later, the County declined to process the two letter requests and rejected them through a written letter. (Ex. 22.)

At the time, LDR 8.6.2 provided "[a] zoning compliance verification may be requested *for any property*, portion of a property, or attribute of a property's physical development, use, development options, or subdivision" and "a zoning compliance verification application may be submitted *by any member of the public*." (Ex. C-19 at 20-21) (emphases added). LDR 8.6.2 also provided that the Planning Director shall issue or issue with conditions a zoning compliance verification within 45 days of the request being deemed sufficient. (*Id*. at 21) Further, LDR 8.6.1 provided that "[a] formal interpretation may be requested to interpret any provision of these LDRs" and "a formal interpretation may be submitted by *any landowner or resident of the County*." (*Id*. at 18-19.) (emphasis added). LDR 8.6.1 also stated that the Planning Director shall make the formal interpretation within 60 days of submittal of the request. Under LDRs 8.6.1 and 8.6.2, a Planning Director held the exclusive authority to render a "formal interpretation" and a "zoning compliance verification." (*See id*. at 18-21.) Appeals of Planning Director decisions to the Board proceed under LDR 8.8.3.A and B. *Id*.

Sometime after receiving the rejection letter, Mr. Kim-Miller notified his clients that the Planning Director was declining to process the two letter requests and had rejected both requests. Mr. Kim-Miller further advised his clients his office would file an appeal of the rejection. On April 21, 2017, the Alliance and the Kitchens appealed the County's rejection

letter ("the third appeal"). (Ex. 33, *see also* Ex. H-47.) The third appeal challenged the County's decision to deny the Defendants' letter requests relating to the Bar J Property. The Defendants argued the rejection letter, which rejected the two applications submitted by the Defendants, violated the Defendants' rights under the applicable LDRs. (Ex. 33 at 1.) Specifically, the Defendants argued the Planning Director did not have the authority or the right to reject the Defendants' requests under LDR §§ 8.6.1 and 8.6.2. (*Id*. at 5.)

The Defendants maintained the third appeal was not an action taken with respect to the HRH application, relying on LDR 8.8.3.C, which provides that a stay only applies to "further action related to the subject appeal . . ." (Ex. C-19 at 30.) Defendants relied on this provision in maintaining their position that the County did not need to place an additional stay on HRH's application during the pendency of the third appeal relating to the Defendants' own requests. Nevertheless, on April 26, 2017, Teton County notified HRH that, as a result of the second and third appeals, pursuant to LDR 8.8.3.C, it had stayed any further county action on HRH's application to amend the Bar J Master Plan. (*See* Joint Stipulated Facts, ECF No. 153 at 4; Ex. 34).

On May 8, 2017, Teton County and the Defendants stipulated that HRH could intervene in the third appeal and, on the same day, the Board granted HRH the permission to intervene. (*Id*.) On May 12, 2017, Teton County and HRH each filed motions to dismiss the third appeal. (Exs. 49, 51.) The Defendants received and read HRH's and Teton County's motions to dismiss the third appeal.

On July 10, 2017, after receiving the recommendations of the appointed Hearing Officer, the Board granted the motions to dismiss of Teton County and HRH. (Ex. 35.) In

its order dismissing the third appeal, the Board found, as a matter of law, the County's rejection letter was not a "final agency action" and not appealable. The Board also found the Defendants were not aggrieved parties and lacked standing to appeal the rejection letter. Based upon these findings, the Board dismissed the appeal under Wyoming Rules of Civil Procedure 12(b)(1) and 12(b)(6), for failure to state a claim upon which relief can be granted. (*Id*. at 6-14.) The Defendants received and read the Board's order granting the motions to dismiss. The Defendants did not appeal the Board's dismissal of the third appeal to the Teton County District Court. At the time the Board dismissed the third appeal, HRH had eighty-two days remaining on its option to purchase the Bar J Property. (*See* Joint Stipulated Facts, ECF No. 153 at 4.)

**The Expiration of the Bar J Option Agreement**

On August 14, 2017, HRH requested an additional extension to the option agreement from Mr. Humphrey. (*See* Joint Stipulated Facts, ECF No. 153 at 4.) Mr. Humphrey refused to grant an extension of the option beyond the then-current expiration date of September 30, 2017, as he had previously granted two extensions of the option period. (*Id*., *see also* Ex. 7.) Accordingly, pursuant to the 2017 Extension Agreement, and without any further extensions, the option expired per its own terms on September 30, 2017. (*Id*., *see also* Ex. 5.) Under the 2017 Extension Agreement, the purchase price of the Bar J Property as of September 30, 2017 was $16,000,000. (Ex. 5.) After the option contract expired per its terms, HRH withdrew its application to amend the Bar J Master Plan on or around October 2, 2017. (*See* Joint Stipulated Facts, ECF No. 153 at 5.)

**The Likelihood of Success of HRH's Application to Amend the Bar J Master Plan**

The evidence presented at trial indicated HRH did not expect success from the application as it was submitted, specifically due to the categorization and numerosity of the units proposed. Nannette Beckley, Teton County realtor and a lender/investor in HRH's project development efforts, testified in her deposition that she and HRH understood "[the County] would never approve what we presented because we were – we put high numbers in to negotiate it to a lower scale." (Ex. Z-2-1 at 72.) Similarly, she testified, "[w]e never thought we were going to do 69 units on the property. . . There was never consideration of that many units. It was all a negotiating tactic with the county." (*Id.* at 33.) She also testified she understood the application would not have been approved as it was submitted on March 2, 2017. (*Id.* at 72.) Despite these statements, HRH never offered or even expressed an intent to decrease the density of their proposed development to be less than 69, as it was financially more profitable to keep the number of units higher. (*See, e.g.,* Exs. F-9, E-81 ("I want to cram as many units as possible into the site plan given the wetlands."), I-29 ("Developer Steve Hancock made clear that the objective was to make the development as profitable as possible.").)

This testimony is further supported by the statements of land use planner, Scott Pierson, who HRH hired to design and seek approval of its proposed development. Mr. Pierson indicated only five months before the application was withdrawn and two months after it was submitted, that it was unlikely HRH could get the application approved as it was submitted. He stated in an email to HRH, "When this started I asked Susan Johnson senior planner what she thought we could get through. She said 50/50 split may make it.

Two weeks ago I asked her again and she said, 'well the outright base density is 6 units.' I corrected her and said 7 units." (Ex. E-98 at 2.) Mr. Pierson's email reflects the opposition HRH was likely to face with its application which anticipated 69 units on the Bar J Property upon completion of its development.

Furthermore, the County had expressed issues concerning HRH's application to amend the Bar J Master Plan to HRH throughout the summer of 2017. Principal Planner Mr. Hurley advised HRH of "a number of issues" he wished to address before moving forward. (Ex. P-13.) These issues concerned water and sewer systems for the property, traffic impacts, Housing Department concerns, and problems with the density of the development specifically with respect to wildlife migration. (*See* Exs. P-12, P-20, P-8, P-13.)

On August 23, 2017, Mr. Hurley informed HRH that August 25, 2017 was his deadline for sending out the neighborhood notices of a hearing, but he suggested postponing the hearing, explaining, "Given the uncertainties in the application, it would be advisable to postpone the hearings and the mailings. Please let me know if you wish to postpone and for how long." (Ex. P-15.) Mr. Hurley's statements leading up to the expiration of HRH's option agreement indicated the County was not inclined to approve HRH's application without significant amendments and adjustments. HRH did not present any evidence of its willingness or efforts to mitigate the issues brought forth by the County—before, during, or after the pendency of any appeals.

On August 25, 2017, Mr. Hurley met with HRH to discuss its pending application. Shortly after the meeting, Mr. Pierson's office informed the County that HRH needed to

postpone its next scheduled meeting for the Bar J Project until at least October. (*See* Ex. P-24, *see also* Ex. P-17 at 2.) Despite this, on that same day, Mr. Hancock advised Mr. Humphrey of HRH's "encouraging meeting" with the County, explained the "positive tone of the meeting" and requested an additional extension of the option to March 31, 2018. (Ex. 36.) Mr. Hancock indicated the application had "a few clerical and clarification points" but that there was "no push back with regard to the number of units and the overall request to amend the Bar J master plan from commercial to residential." (*Id.*) No action was taken by HRH to address the deficiencies highlighted by the County in the application to amend the Bar J Property Master Plan.

Finally, Mr. Collins, former Teton County Planning Director and the Defendants' retained expert on the LDRs concerning the Bar J Property, testified to his knowledge of a draft staff report completed by Mr. Hurley concerning HRH's application which ultimately recommended a denial of the application. By way of background, Mr. Pierson testified that Teton County's Planning Staff prepares a staff report once an application is submitted and deemed sufficient. (*See also* C-19 at 15.) After a determination of sufficiency, the Planning Staff collects information and feedback from other staff members and relevant agencies concerning the application. After receiving the feedback, the Planning Staff prepares a staff report which contains a staff recommendation. Mr. Collins explained that staff reports are typically prepared and disseminated to the public, the Planning Commission, and the applicant a week to ten days prior to a Planning Commission meeting which would address the given application. In this case, Mr. Collins testified he was provided a draft of Mr. Hurley's staff report, which was never submitted to the Planning Commission because of

HRH's eventual withdrawal of its application. Mr. Collins testified he understood the draft staff report to contain the opinion of the likelihood of success of HRH's pending application, even though it was never finalized. He testified the draft report contained a statement near the bottom recommending denial of HRH's application, and statements within the body of the report indicating the proposed application was not in compliance with various LDRs.

This cumulative evidence presented at trial support the fact that approval of HRH's application to amend the Bar J Master Plan was unlikely, at best.  After the September 30, 2017 expiration of the 2017 Extension Agreement, Mr. Reynolds drafted a letter, written as if it was authored by Mr. Humphrey and sent to HRH, declining to extend the option for a third time. (*See* Ex. 7.) Sometime on or around October 2, 2017, HRH withdrew its application to amend the Bar J Master Plan. (*See* Joint Stipulated Facts, ECF No. 153 at 4.)

In April of 2021, Mr. Humphrey listed the Bar J Property for sale through a local real estate agent at a list price of $14,000,000. In May 2020, the agent emailed Mr. Hancock to inform him the Bar J Property was listed and encouraged him to make an offer. Mr. Hancock did not respond, and HRH made no subsequent bids to purchase the Bar J Property. In January 2021, the Bar J Property sold for $13,000,000.

## CONCLUSIONS OF LAW

To the extent the above stated Finding of Fact contain any conclusions of law they are hereby incorporated herein.

The Court has diversity jurisdiction under 28 U.S.C. § 1332(a). Venue is proper under 28 U.S.C. § 1391(b)(2). As a federal court sitting in diversity, the law of the forum

state applies to substantive issues and federal law applies to procedural issues. *Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 683 (10th Cir. 2007). Wyoming is the forum state in this case, so Wyoming law will apply to the issues currently before the Court.

**Applicable Law—Tortious Interference**

The parties generally agree as to the elements of a claim for intentional or tortious interference with a contract or business expectancy (hereinafter, "tortious interference claim") under Wyoming law.

The Wyoming Supreme Court has adopted the general description of tortious interference from Restatement (Second) of Torts § 766B (Am. L. Inst. 1979), which provides:

> One who intentionally and improperly interferes with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of
> (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> (b) preventing the other from acquiring or continuing the prospective relation.

*See Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 21, 421 P.3d 518, 523-24 (Wyo. 2018) (citing *Ahrenholtz v. Laramie Econ. Dev. Corp.*, 2003 WY 149, ¶ 17, 79 P.3d 511, 515 (Wyo. 2003)).

To succeed on a claim for tortious interference, the Plaintiff must prove the following elements: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant, (3) intentional **and** improper interference by defendant who is a nonparty to the contract,

and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Gore v. Sherard*, 50 P.3d 705, 710 (Wyo. 2002), *see also* Court's Order on Summary Judgment, ECF No. 105 at 20. Whether interference with a contract was improper is a question of fact. *See Basic Elec. Power Co-Op—Missouri Basin Power Project v. Howton*, 603 P.2d 402, 405 (Wyo 1979); *First Wyoming Bank, Casper v. Mudge*, 748 P.2d 713, 717 (Wyo. 1988). This Court found on summary judgment there was a disputed fact as to the "improper" element specifically. (ECF No. 105 at 20-21.)

While the Wyoming Supreme Court has adopted Restatement (Second) of Torts § 766 ("Intentional Interference with Performance of Contract by Third Person") and § 766B ("Intentional Interference with Prospective Economic Relations"), it has declined to adopt § 766A ("Intentional Interference with Another's Performance of His Own Contract"). *See Price v. Sorrell*, 784 P.2d 614 (Wyo. 1989). In clarifying the difference between the three Restatement sections, the Wyoming Supreme Court explained,

> [Section] 766 deals with the situation where A may be liable to B for causing C not to perform a contract between B and C; § 766A deals with the situation where A may be liable to B for preventing B from performing a contract between B and C; and § 766B deals with the situation where A may be liable to B for causing C not to enter into or continue a prospective contractual relationship with B or for preventing B from entering into or continuing a prospective contractual relationship with C.

*Birt v. Wells Fargo Home Mortg., Inc.*, 2003 WY 102, ¶¶ 72-73, 75 P.3d 640, 663 (Wyo. 2003). The Wyoming Supreme Court further found the difference between § 766 and § 766A—which it has not recognized—is significant. In *Price*, the Court explained, § 766 requires improper interference with a contract which induced or caused a third party not to perform and § 766B requires for recovery that a prospective contractual relation was lost

because of the interference. *See* 784 P.2d at 616. Unlike those sections, though, § 766A allows a plaintiff to recover by showing only that his own performance was made more expensive or burdensome by the interference. *Id.*

In this case, HRH's tortious interference claim against the Defendants falls squarely under § 766B. (*See* Plaintiff's Proposed Findings of Fact, Conclusions of Law, ECF No. 188 at 22-25.) HRH alleges the appeals Defendants filed with Teton County—which, in response, issued automatic stays pursuant to the applicable LDRs—intentionally and improperly interfered with its option agreement to purchase the Bar J Property. In short, HRH argues the delays caused by the Defendants' appeals effectively prevented HRH from ever exercising the option, which also made it so HRH could never develop the property according to its application to amend the Bar J Property Master Plan. Therefore, HRH seeks damages to recover both the lost profits from the 69-unit development proposal, the amount of the option contract itself, and the amount it expended in pursuing in development proposal.

### 1. *Existence of a Valid Contractual Relationship or Business Expectancy*

In turning to the elements of a tortious interference claim under Wyoming law, this Court finds HRH has failed to meet its burden to prove all elements by a preponderance of the evidence. *See Gore*, 50 P.3d at 710 ("The plaintiff has the burden of proving the four elements of intentional or tortious interference with a contract.").

First, the Court finds that the option contract between HRH and Mr. Humphrey is sufficient evidence of a valid contractual relationship. Both members of HRH and Mr. Humphrey testified as to their shared understanding of the terms of the option contract. The

parties do not dispute there existed a valid option contract between HRH and Mr. Humphrey to purchase the Bar J Property. Defendants contend, however that HRH's alleged expectancy from the option contract was based upon situations which were so unlikely that the business expectancy of the contract was sheerly speculative. (*See* Defendants' Corrected Proposed Findings of Fact, Conclusions of Law, ECF No. 193 at 30-31.) While this could be true, the option contract itself was a valid contract according to the parties, as was their contractual relationship. Accordingly, the Court finds the first element, that there exists "a valid contractual relationship *or* business expectancy" is satisfied. *See Gore*, 50 P.3d at 710 (emphasis added).

### 2. *Knowledge of the Relationship or Expectancy on the Part of the Defendants*

The Defendants conceded at trial that, at some point in time, they became aware of the option contract between HRH and Mr. Humphrey to purchase the Bar J Property. Mr. Braddy, the representative for the Alliance, testified that he learned about HRH's proposed development of the Bar J Property sometime in the summer of 2015. Mr. Braddy also testified that he learned sometime in May of 2016 that HRH had an option to purchase the Bar J Property. The Alliance communicated this information to its members, which included Mr. and Mrs. Kitchen. (*See* Ex. I-17.) Mr. and Mrs. Kitchen both testified to learning sometime in May of 2016 that HRH had an option to purchase the Bar J Property. Defendants testified as of May 2016 they were unaware of the nature of the option agreement and business relationship between HRH and Mr. Humphrey, despite their understanding one existed. The Alliance filed its first appeal on May 2, 2016, before it realized HRH had an option to purchase the Bar J Property.

On July 23, 2016, the Defendants discussed their understanding of the 2016 Option Contract's expiration of December 31, 2016. (Ex. 55.) The Defendants all testified they were unaware of the September 30, 2017 extension granted by the 2017 Extension Agreement until *after* they had filed the second and third appeals in March and April of 2017.

Even so, all Defendants conceded—and the evidence at trial showed—that at some relevant point in time, the Defendants understood HRH to have an option to purchase the Bar J Property. *See Furr v. Ridgewood Surgery and Endoscopy Center, LLC*, 192 F.Supp.3d 1215, 1228 (D. Kan. 2016) (finding, in a tortious interference claim with similar elements, that the law does not require that defendants know the details of the contract.) Accordingly, the second element, that the Defendants knew of the contractual relationship between HRH and Mr. Humphrey, is satisfied. *See Gore*, 50 P.3d at 710.

### 3. *Intentional and Improper Interference by the Defendants*

HRH alleges the Defendants, by filing their appeals, intentionally and improperly interfered with HRH's option contract to purchase the Bar J Property. Defendants allege the interference was not intentional under the meaning of the Restatement since the Defendants were not aware of the 2017 Option Extension, and therefore, they were not aware the appeals would bring about an end to the contractual relationship between HRH and Mr. Humphrey. Similarly, the Defendants assert their alleged interference, done through filing the appeals, was not "improper" under the Restatement factors. The Court agrees.

### a. No Intentional Interference

Under Restatement (Second) of Torts § 766B, an interference is intentional if "the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." *See* cmt. d. (Am. L. Inst. 1979). The Court heard evidence from the Defendants that they were aware of the option contract, but were not necessarily aware of the expiration or terms of the option at the time of the filing of the appeals. Therefore, HRH failed to establish the Defendants, by filing their appeals with the County, desired to interfere with HRH's option contract. *See id*.

Similarly, the Court finds the Defendants did not know the termination of the option agreement was a "certain or substantially certain" result of their appeals. *Id*. All Defendants testified to understanding the County would impose automatic stays under the LDRs when an appeal was filed. However, the Defendants also testified the appeals were not filed to initiate the automatic stays. Rather, the automatic stays were a collateral consequence of the appeals. Evidence at trial also supported this, as various emails concerning the appeals and the Defendants' strategy in filing their appeals demonstrated a desire to ensure the County was correctly following the LDRs, not a desire to stall HRH's application, despite it being a consequence of the appeals. (*See, e.g.,* Exs. 20 at 2 ("our objection in filing an appeal was to preserve the right to appeal the [Planning Director's] decision . . .", ), 21 at 1 ("Would the P&D this time be willing to tell us there has been no final administrative action, so we don't have to file suit against as we did last time? I assume we will learn more at the Feb 9 meeting, but we don't want to lose any time. . ."), 24 at 1, *see also* Ex. I-15 ("The Alliance is not opposed to the sale or the development of the Bar J property so long as any such development conforms to existing zoning and to the County

Comprehensive Plan.", Ex. I-17 ("We have said earlier, and it bears repeating, that the Alliance is not opposed to redevelopment of the Bar J property. We would support reasonable development consistent with the character of the neighborhood; . . .").)

Additionally, evidence at trial showed the first appeal filed by the Alliance was dismissed upon stipulation of the parties. (*See* Ex. L-18.) This conflicts with HRH's position that the Alliance intended to stall the application process with the understanding HRH would lose the time to exercise its option to purchase the Bar J Property. True, Defendants were aware the appeals would likely initiate county-imposed stays. However, Defendants' stipulated dismissal removed that stay. Similarly, the evidence at trial indicated Defendants objected HRH's development of the Bar J Property, at least the development proposal presented in the application to amend the Bar J Master Plan. (*See, e.g.*, Exs. I-17, I-29, I-31, 55.) However, HRH fails to establish the Defendants intended their appeals, or even knew their appeals, would result in HRH losing time to exercise its option. Therefore, the Court finds the Defendants' interference—filing the three appeals of the County's decisions regarding the application to amend the Bar J Master Plan—was not done with the intent to interfere with HRH's option contract.

### b.  No Improper Interference

Even if this Court were to find that Defendants intentionally interfered with HRH's option contract, the Court finds that Defendants' have shown that their interference was not improper. *See* Restatement (Second) of Torts § 767 cmt. a ("there is a requirement that the interference be both intentional *and* improper.") (emphasis added).

The Wyoming Supreme Court has avoided crafting a mechanical rule to determine whether conduct causing interference with a contract or expectancy is improper or unjustified. *See, Basin Elec. Power Co-op.-Missouri Basin Power Project v. Howton*, 603 P.2d 402, 404 (Wyo. 1979). Instead, it has relied on the Restatement's definition of improper interference, laying out the determinative factors from § 767. Factors to be considered for determining whether interference was improper are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.

*Toltec Watershed Improvement Dist. v. Johnston*, 717 P.2d 808, 814 (Wyo. 1986) (citing Restatement (Second) of Torts § 766[3] (Am. L. Inst. 1979)) (internal quotations omitted). No one factor is dispositive on the issue of improper conduct and the comparative weight of the factors may vary considerably depending on the consideration of the facts. *See* Restatement (Second) of Torts § 767 cmt. a. (Am. L. Inst. 1979). In analyzing the factors under § 767, the Court finds the factors weigh in favor of the Defendants and establish that Defendants did not act improperly in filing their appeals with the County.

Beginning with the nature of the actors' conduct, HRH argues the Defendants' wrongful conduct was the filing of the objectively groundless appeals, noting this Court had already characterized them as such on summary judgment. As an aside, this Court is

---

[3] Despite the reference to Section 766, these factors are enumerated in Section 767 of the Restatement (Second) of Torts (Am. L. Inst. 1979).

not bound by its prior categorization of the Alliance Defendant's appeals from summary judgment for the matter of a final order following a bench trial. *See Lieberman v. Mossbrook*, 2009 WY 65, ¶ 29, 208 P.3d 1296, 1305-06 (Wyo. 2009) (finding the law of the case doctrine is subject to exception when evidence in a subsequent trial is substantially different from that presented in an earlier proceeding).

Here, evidence was presented at trial not previously before the Court on summary judgment which demonstrated the appeals filed by the Alliance and the Kitchens were not objectively baseless. The issues raised and appeals taken by Defendant, based upon the testimony and exhibits, presented good faith concerns under the LDRs, as to the applicable zoning requirements.  In addition, Defendants had a good faith basis to have concerns with potential waiver of their objections and justifiably filed appeals to at a minimum preserve those objections. The Court heard evidence about the Defendants' diligent efforts to select the appropriate course of action prior to filing their appeals, obtaining counsel and Mr. Collins to assist in comparing the development proposal to the existing LDRs.

The Court also learned from HRH's land planning expert, Mr. Pierson, that HRH's application, without substantive changes, was extremely unlikely to be approved by the Board. This finding had nothing to do with the Defendants' appeals. Similarly, the Court heard evidence about HRH's complete lack of and inability to obtain funding to develop the project if and when it ever was approved. The evidence learned at trial about the conscientious efforts of the Defendants prior to filing the appeals, was substantially different than what was presented on summary judgment, and this Court is not bound by its prior finding that the three appeals were objectively baseless.

Turning then to the first factor under § 767, the nature of the Defendants' conduct is a chief factor in determining whether the conduct was improper or not. *Id*. at cmt. c. The Alliance filed three appeals of three separate decisions by Teton County related, at least in part, to the Bar J development proposal. The Kitchens individually joined only the third of the three appeals which the Alliance filed. (*See* Ex. 33.) All three appeals were filed at the direction of legal counsel and all three appeals were defensible under the then-existing language of the LDR Section 8.8.3.A which permitted aggrieved persons affected by "any decision or interpretation by the Planning Director . . . to appeal the decision or interpretation[.]" (Ex. C-19 at 30.) Importantly, the Defendants' conduct never involved speaking to Mr. Humphrey, the other party to HRH's option contract. Nor did it ever involve the Defendants filing competing applications or proposals for development. Instead, the Defendants filed the appeals to try to ensure the County was properly applying the LDRs when it considered HRH's application to amend the Bar J Master Plan. Moreover, communications sent out by the Alliance to its members reflect thorough and well-considered efforts to understand the applicable provisions and to engage in a process it believed was of its own right. (*See* Exs. I-12, I-15, I-17, I-20, I-25, I-29-31.) This conduct, which certainly resulted in collateral consequences leading to delays in the application approval process, does not demonstrate *improper* action on behalf of Defendants.

The second factor considers the Defendants' motive in filing the appeals. Since intentional interference with a contract is an intentional tort, "the injured party must show that the interference with his contractual relations was either desired by the actor or known by him to be a substantially certain result of his conduct." Restatement (Second) of Torts

§ 767 cmt. d. While certainly self-serving, all Defendants testified at trial their motivation was to ensure the County adhered to the LDRs applicable to new development proposals. Aside from the testimony, the evidence presented supports Defendants' assertion. Defendants sought to stop HRH's proposed development since, in Defendants' minds and that of their legal counsel, it egregiously failed to comply with the applicable LDRs. (*See* Exs. 57-62, I-17, I-31.)  However, as this Court determined as to Defendants' intent, HRH failed to present evidence that the Defendants' motivation was to prevent HRH from exercising its option to purchase the Bar J Property, or that the Defendants were substantially certain the option contract would no longer be viable due to their appeals with the County.

All Defendants testified they were  not aware of the September 30, 2017 expiration date until after all three appeals were resolved. Though they at one time knew the option was set to expire in December of 2016, there was no evidence the Defendants had any level of certainty that their appeals would result in Mr. Humphrey declining to issue a third extension on the option contract with HRH.

The same analysis follows with respect to the fourth factor, the interests sought to be advanced by the actor. Restatement (Second) of Torts § 767(d), *see also id.* at cmt. d ("There is obviously a very intimate relation between the factors of motive and of the interests that the actor is trying to promote by his conduct. . . [T]he factor of motive is concerned with the issue of whether the actor desired to bring about the interference as the sole or a partial reason for his conduct, while the factor of the actor's interests is concerned with the individual and social value or significance of any interests that he is seeking to

promote."). In this case, the Defendants' shared interest was to ensure the Bar J Property was developed in accordance with the applicable LDRs. (*See, e.g.* I-17, I-20, I-31.) The Defendants lived in close proximity to the property and, therefore, had an interest in ensuring surrounding properties were properly developed. HRH failed to present any evidence that the Defendants' interest was, either in part or in full, to prevent HRH from exercising its option to purchase the Bar J Property.

The third factor concerns HRH's interest in exercising the option contract to purchase the Bar J Property. *See* Restatement (Second) of Torts § 767(c). Evidence presented at trial indicated HRH's interest in purchasing the property was purely financial—an unsurprising finding in a land development contract. Even so, evidence also established HRH's interest was so purely financial that it prevented HRH from diligently working with the County to ensure its application met the requirements set forth in the applicable LDRs. (*See, e.g.,* Exs. E-92, F-9.) In any event, HRH's interest in purchasing the Bar J Property does not weigh heavily in favor or against any one party, as HRH's interest in the option contract was valid, notwithstanding its unrealistic proposal with the County to develop the property.

The fifth factor in the Restatement explores the social interests in protecting the freedom of the Defendants' filing of appeals compared with the contractual interests of HRH. Restatement (Second) of Torts § 767(e). In this case, the Court finds the interests between the parties are fairly balanced. The Defendants undertook a public process through means identified in County regulations, which presents an important interest in active participation in local government. Similarly, the right to transact and develop land freely

is also an important social interest, so HRH's opportunity to purchase the Bar J Property—notwithstanding the feasibility of any proposed development—is an interest worth protecting. *See Thar v. Edwin N. Noram Revocable Trust*, 905 P.2d 413, 415 (Wyo. 1995) (explaining how the law favors alienability of property interests because social interests are promoted by greater utilization of property rights) (citing Restatement of Property § 489 (Am. L. Inst. 1944)).

The sixth factor looks at the proximity of the Defendants' conduct to the interference with HRH's option contract.  Restatement (Second) of Torts § 767(f). The Court finds this factor weighs in favor of the Defendants. The Defendants' three appeals undisputedly did cause some period of delay in the County's processing of HRH's application to amend the Bar J Master Plan. (*See, e.g.,* Ex. W-6.) However, Mr. Humphrey's choice not to extend the option agreement for a third time was not "an immediate consequence of the [Defendants' appeals]." *See* Restatement (Second) Torts § 767 cmt. h. HRH argued the letter from Mr. Humphrey declining to extend the option was evidence that the appeals were the reason for Mr. Humphrey's choice not to extend. (*See* Ex. 7.) While it could be true, the statements made by Mr. Humphrey in his letter are less persuasive since Mr. Humphrey testified that Mr. Reynolds, one of the two members of HRH, actually drafted the letter for Mr. Humphrey to sign. Additionally, even if Mr. Humphrey was fed up with the delays resulting from the appeals filed by the Defendants, evidence showed HRH could have still exercised its option to purchase at any time before the expiration of the option on September 30, 2017. (*See* Ex. 5.) Additionally, the delays from the appeals were not the only delays in the process of HRH's application, as the stays from the appeals only

encompassed approximately twenty one percent of the duration of the option contract. (*See* Ex. W-6.) There were many delays resulting from deficiencies and other issues with HRH's application, including the need to conduct an EA. (*See* Exs. E-86, E-91, E-92, E-98.) Accordingly, HRH failed to establish Mr. Humphrey's choice not to extend the option contract for the third time was "an immediate consequence" of the Defendants' appeals.

The final factor considers the relations between the parties, including the third-party to the contract who is not a party to the case. Restatement (Second) of Torts § 767(g), *see also id*. at cmt. I ("In a case where A is the actor, B is the injured party and C is the third party influenced by A's conduct, the significant relationship may be between any two of the three parties."). In this case, there is no significant relationship between the Defendants and HRH or the Defendants and Mr. Humphrey. The parties testified to having minimal interaction with one another during relevant time period. Similarly, Mr. Humphrey and the Defendants consistently testified they had no interaction during the relevant time period. HRH and Mr. Humphrey did have a meaningful business relationship, as the parties had entered into the option contract to transact the Bar J Property. However, this factor is not material to this Court's analysis of the impropriety of the Defendants' conduct.

Overall, the Court finds the majority of the factors enumerated in § 767 weigh in favor of finding Defendants' conduct was not improper. The determination of whether the Defendants' conduct was improper seeks to ask whether the conduct was fair and reasonably justified under the circumstances. *See Toltec*, 717 P.2d at 814. This Court finds that it was.

The appeals process, the specific and unique provisions of the Teton County LDRs, and local practices were unknown to Defendants before they engaged legal counsel. (*See* Ex. I-12 ("[A] group of concerned Teton Pines homeowners retained counsel and . . . also retained other consultants and subsequently, among other things, met with legal counsel and county planning officials to better understand the proposal and the processes.").) While the appeals may have suffered from procedural deficiencies based upon principles of administrative law, Defendants' counsel advised the Defendants that the appeals were ripe under the LDRs and necessary to avoid waiver. (*See* Ex. I-17 at 2, I-20, I-30 at 1.) Defendants' engagement of legal counsel and Mr. Kim-Miller's role and advice in preparing the appeals based on his evaluation of the LDRs is highly relevant evidence and tends to negate the "improper interference" element—even if the legal advice was wrong. *See Sysdyne Corp. v. Rousslang*, 860 N.W. 2d 347 (Minn. 2015) ("a defendant's interference with a contract may be justified by reliance on advice of counsel."); 22 Am. Jur. 2d Damages § 582 (2016) ("The fact that a defendant sought the advice of counsel before acting is relevant to the defendant's knowledge and intent.").

The Wyoming Supreme Court has further recognized that "one who interferes with a contract asserting a bona fide claim in good faith is not liable for tortious interference with a contract[.]" *Sunshine Custom Paints & Body, Inc. v. S. Douglas Highway Water & Sewer Dist.*, 173 P.3d 398, 404 (Wyo. 2007); *see also Toltec*, 717 P.2d at 814-15 ("The defendant is also permitted to interfere with another's contractual relations to protect his own present existing economic interests, such as the ownership or condition of property,

or a prior contract of his own, or a financial interest in the affairs of the person persuaded.")
(citing Prosser and Keeton, Law of Torts § 129, p. 986 (5th ed. 1984)).

Consistent with these principles, in *Toltec*, the Wyoming Supreme Court rejected tortious interference claims where the defendants had instituted repeated unsuccessful litigation against the plaintiff, but did so to raise valid property interests based on plaintiff's efforts to construct a dam on one of the defendant's properties. *See* 717 P.2d at 813-15 (Wyo. 1986) (observing that while defendants' motives "were anything but virtuous" there was no basis to sustain claims for abuse of process or malicious prosecution and defendants were not liable for tortious interference because they were only trying to protect their property interests.). A similar situation existed here, landowners surrounding the proposed development site sought to protect their valid property interests based on HRH's proposed development which Defendants believed was ultimately not allowed under the applicable regulations, and would negatively affect their property.

The first appeal was filed based on Defendants' legitimate understanding informed by their legal counsel and Mr. Collins that HRH's contemplated development as a PUD was contrary to the LDRs. The first appeal therefore had the effect of promoting a framework under which HRH's application would properly be submitted and considered based on the agreement of all parties, including HRH. Given this, and because HRH did not even submit its application to amend the Bar J Master Plan until March 2, 2017, over eight months after the stipulated dismissal of the first appeal, the first appeal does not constitute improper interference. Furthermore, the stipulated dismissal signed by the Alliance and HRH conflicts with HRH's position that the Defendants' primary or even

partial intention was to delay HRH's application with the County. Upon assurance that the application would not be treated as conversion to a PUD and that the underlying NC zoning would apply the Alliance agreed to a more expedient resolution of the first appeal.

As for the second and third appeals, Defendants' conduct was not intended "only to harass." Rather, as influenced and informed by the advice of legal counsel, Defendants held "good faith" beliefs that the appeals were authorized under LDR Sections 8.8.3.A and 8.8.3.B (allowing appeals of "any decision or interpretation of the Planning Director"). (*See* Ex. C-19 at 30.) Further, Defendants subjectively believed the appeals had substantive merit based on the County's position changes and its apparent ongoing disregard of the PUD prohibition and the property's zoning. The second appeal challenged the County's determination of sufficiency of HRH's application and corresponding EA. (*See* Ex. 30.) Relying on applicable LDRs and counsel, The Alliance believed a "Determination of Sufficiency" was a specific decision point in the administrative process, enabling the Alliance to appeal such a determination. Similarly, the third appeal challenged the County's determination to deny the Defendants' request for a ZCV and Formal Interpretation. (*See* Ex. 33.) The letter requests were made based on concerns of the Sufficiency Determinations issued by the County. Again, relying on applicable LDRs Sections 8.6.1, 8.6.2 and counsel, the Defendants believed they were entitled to their requested documents. (*See* C-19 at 18-21.)

At no time did any of the Defendants directly contact either of the contracting parties so as to thwart the underlying deal between them or otherwise prevent HRH from purchasing the Bar J Property. In sum, seeking to voice their concerns based upon their

valid property interest, Defendants did not improperly set out to harm the HRH or Mr. Humphrey or even to stop HRH's development of the Bar J Property. Given the location of their property and interests Defendants sought to uphold community-endorsed standards and zoning laws bearing on Defendants' property rights and legitimate concerns surrounding HRH's efforts to achieve a tenfold increase in density beyond what they justifiably believed zoning permitted. In addition, Defendants believed such an outcome would have adversely impacted traffic, wildlife, property values, and the general quality of life along Teton Village Road. *See Four Nines Gold, Inc. v. 71 Const., Inc.*, 809 P.2d 236, 244 (Wyo. 1991) (Urbigkit, C.J. dissenting) ("whether a defendant has acted improperly [] generally is determined by weighing the social importance of the interest the defendant seeks to advance against the interest invaded.").

Ultimately, this Court finds Defendants' conduct in the filing of appeals does not constitute improper interference. Accordingly, Plaintiff[4] has failed to prove the four elements of tortious interference with a contract. *Gore v. Sherard,* 50 P.3d 705, 710 (Wyo. 2002) (burden is upon Plaintiff to prove the four elements of intentional or tortious interference with a contract).

### 4. *Resultant Damage to HRH*

Even if this Court was found to be in error as to the intentional and improper elements HRH has failed to prove that it was or would have suffered damages as a result of the alleged interference. Additionally, the damages HRH claims are purely speculative

---

[4] To the extent Wyoming caselaw might suggest that the burden of proving sufficient justification for its interference rests with the party defending its conduct, (*see Examination Management Services, Inc. v. Kirschbaum,* 927 P.2d 686, 698 (Wyo. 1996), the Court would expressly find that Defendants have done so.

and unsupported by the evidence, such that they have not been proven to a reasonable degree of certainty.

**Causation**

First, Defendants can be held liable for a tortious interference claim "only if [they] cause[d] the loss." *Spurlock v. Ely*, 707 P.2d 188, 190 (Wyo. 1985) (citing Prosser & Keeton, Torts, § 129, p. 989 (5th ed. 1984); *First Wyoming Bank, Casper v. Mudge*, 748 P.2d 713, 717 (Wyo. 1988) ("A party is entitled to all damages which will compensate for all the detriment proximately caused by the breach of duty."). Therefore, a claim for intentional interference with prospective economic advantage/business expectancy requires proof of causation. *See Texas W. Oil & Gas Corp. v. Fitzgerald*, 726 P.2d 1056, 1064 (Wyo. 1986) ("We have previously held that the measure of damages for intentional interference is the amount which will compensate for all of the detriment proximately caused by the breach of duty."). The essence of proximate cause is foreseeability of the risk presented by the actor's conduct. *Wood v. CRST Expedited, Inc.*, 2018 WY 62, ¶ 9, 419 P.3d 503, 506 (Wyo. 2018). To establish causation under Wyoming law, a plaintiff is entitled to rely upon circumstantial evidence. *Bettencourt v. Pride Well Serv., Inc.*, 735 P.2d 722, 727 (Wyo. 1987).

Here, the parties agree HRH failed to exercise its option on or before September 30, 2017. The parties also agree Mr. Humphrey declined to extend a third extension to HRH, which may or may not have provided HRH the time to continue with its proposed development with the County. (*See* Exs. 7, 8.) The parties to the option contract testified at trial, that despite the option contract not containing such a clause, the parties understood

the option contract would only be exercised if HRH received the necessary "entitlements"[5] from the County to develop the project according to its proposal. In other words, HRH and Mr. Humphrey understood the County had to approve of HRH's application to amend the Bar J Master Plan in order for HRH to exercise its option with Mr. Humphrey to purchase the property.

Here, HRH argues that Defendants' filing of appeals, specifically the second and third appeals, caused HRH to lose its business relationship with Mr. Humphrey since the appeals were the stated reason Mr. Humphrey refused a further extension on the option contract. (ECF No. 188 at 31, *see* Ex. 7.) To connect this point, HRH explains the appeals prevented HRH from obtaining approval for its application from the County, which in turn, caused Mr. Humphrey to refuse the extension. (*Id*.) The evidence presented at trial does not support such a finding.

First and foremost, HRH's position is predicated on the idea that its application would have been approved "but for" the Defendants' filing of the appeals. *See First Wyoming Bank*, 748 P.2d at 717 (finding the jury's decision on damages was correct, considering "but for the Bank's improper interference" the other party would not have incurred the consequent expenses and costs). Aside from any financial means, the evidence presented at trial plainly invalidates this point. HRH had many barriers to its application being approved by the County, especially within the timeframe under the 2017 Extension Agreement set to expire on September 30, 2017.

---

[5] Mr. Hancock confirmed in his testimony that "entitled" meant approval of the application HRH submitted to the County calling for 46 free-market units and 23 affordable housing units.

HRH proposed a 69-unit development on a parcel of property zoned for seven units. Moreover, the ratio of affordable housing to free-market housing provided for two thirds free-market and one third affordable units, which HRH and Scott Pierson knew would be an issue with the County. (*See* Exs. E-86 at 1 (identifying segregation of affordable and free-market homes to be an item the County was considering), E-91 ("I believe that this project has little chance of positive vote by the Board of County Commissioners unless the ratio is about 50-50 or higher."), E-98 at 2 ("When this started I asked Susan Jonson [sic] senior planner what she thought we could get through. She said 50/50 split may make it. Two weeks ago I asked here [sic] again and she said, 'well the outright base density is 6 units.' I corrected her and said it is 7 units.").)

Aside from the potential issues with the overall density of the project increasing the underlying zoning by almost tenfold, HRH was advised of other problems with its application to amend the Bar J Master Plan. Mr. Hurley, the County Planning Director, advised Mr. Pierson of several issues with the application. First, HRH learned in February of 2016 that it would need to conduct an EA in connection with any development application that might be filed. (Ex. E-62 at 2.) This information followed HRH's filing for an "EA exemption" on December 24, 2015, which the County denied. (*Id*.) HRH knew as early as October of 2015 it would be required to apply for an EA exemption, but it did not do so until December of 2015. (*See* Ex. E-70 (Mr. Hancock states, "It was not until late December that we applied for such exemption . . . This delay cost 60 days."). It was confirmed HRH would need an EA corresponding to its application in the County's letter on February 17, 2016. (E-62.) Importantly, at the time HRH learned it was required to

conduct an EA on the property, HRH's current option was set to expire less than two months later on May 1, 2016. (*See* Ex. 4.)

Furthermore, as early as March of 2016, HRH was aware it might need to amend its application to "meet the expectations of the County Staff, Planning Commission and the Board of Commissioners." (Ex. E-73.) It declined to make any amendments. On April 29, 2016, the option was extended to December 31, 2016. The EA was not actually completed and submitted until February 24, 2017, over a year after HRH learned it would need to conduct one. (*See* Ex. N-4.) HRH fails to establish how the Alliance's first appeal on May 2, 2016—which ended in a stipulation by all parties—had any effect on HRH's ability to expediently apply for an EA exemption and later conduct an EA once it was confirmed by the County to be necessary.

Next, Mr. Pierson communicated to HRH that he had spoken with Mr. Hurley about issues with HRH's planned proposal, prior to the filing of its application, as early as January of 2017. (*See* Ex. E-86.)  Mr. Pierson explained that the company who conducted the EA had not been paid, there were cabins[6] which might need to be eliminated to accommodate for wetland impacts, the segregation of affordable and free-market units was problematic, there were too many units on the site altogether, and there could be more work to be done concerning aquatic resources. (*Id*.) This information came months after the Alliance's first appeal was dismissed, and two months before the second and third appeals were filed. Moreover, this information was known to HRH prior to its filing of the March

---

[6] Mr. Pierson explained in his testimony the County tended to use the word "cabin" when they were referencing the free-market units.

2, 2017 application. However, HRH was unable to articulate at trial any action it took to address these concerns, by way of amending its application or otherwise. HRH never proposed to change the number or ratio of units prior to filing its application or after.

Additionally, Mr. Hurley, Teton County Planning Director, informed HRH of several issues in its application unrelated to the Defendants' appeals very close to the expiration of the 2017 Extension Agreement. (*See* Exs. P-13 "(We are concluding our review of your applications and there are a number of issues that I wish to advise you of as we move forward.", P-15.) Specifically, there were issues concerning the water and sewer systems from Teton County Engineering Department (Ex. P-12.), traffic impacts which would require a more robust traffic impact study than was provided (Ex. P-20), and issues concerning the Housing Department Rules and Regulations, with which the application did not comply (Ex. P-8 (identifying "a number of deficiencies" regarding the Housing Department).) While HRH lays blame on the delays from the appeals as the justification for not being able to resolve these issues and exercise its option, many, if not all of the issues were known to HRH prior to the Defendants' filing of the second and third appeals.

The evidence shows it was extremely unlikely HRH's application would have been approved by the County, even had Defendants not filed their appeals. Such a finding is also supported by Mr. Pierson's testimony. Mr. Pierson explained it would take approximately seven-and-a half months from the time an application is filed until a "sketch plan" would be approved. According to the LDRs, Section 8.3.1 states that a sketch plan presents the opportunity for the County to "publicly review a large physical development or development option for general consistency with these LDRs at a preliminary, conceptual

level of detail before the development is fully designed." (Ex. C-19 at 14.) After a sketch plan is approved, the applicant may submit a development plan, but sketch plan approval "does not permit actual physical development or subdivision of land." (*Id.*) Therefore, according to Mr. Pierson's testimony, even assuming a quick application review process with little to no issues, it would take seven-and-a-half months for the County to approve the sketch plan corresponding with HRH's application. Mr. Pierson also testified it was possible that the process for sketch plan approval could be drawn out over eight or nine months beyond the filing of the application, especially if there was significant public input on an application, as there was here.

HRH's application was filed on March 2, 2017, which is less than seven months from the September 30, 2017 expiration of the option agreement. Accordingly, it is unlikely HRH would have even received sketch plan approval of its application prior to the expiration of its option contract, not even considering the second and third appeal of the Defendants.

Additionally, when asked by the Court whether he believed, to a reasonable degree of certainty, that HRH's application would have been approved as it was submitted, Mr. Pierson answered, "No." He indicated the major obstructions in the application were the access points to the proposed development, which was already in a high-traffic area, and the inclusion of six units which did not accommodate for existing wildlife migration pathways. Then, the Court asked Mr. Pierson when he believed the project would have been entitled to move forward, given the existing issues with the application. Mr. Pierson indicated he could not speculate as to that timing, nor could he speculate to the timing of

the approval of the application even if the appeals were taken out of the timeline. Ultimately, the Court finds Mr. Pierson's testimony reflective of the extremely low likelihood that HRH's application would ever have been approved by the County without periods of significant delay due to necessary amendments and addressing of the issues highlighted by the County—none of which were impacted by Defendants' appeals.

In sum, HRH has failed to establish, that "but for" the actions of the Defendants in filing the three appeals which led to County-imposed stays, the County would have approved its application to amend the Bar J Master Plan, enabling HRH to exercise its option to purchase the Bar J Property on or before September 30, 2017. Certainly, the Defendants' appeals did cause delay in the pendency of HRH's application process. However, the Court finds that the appeals were not a proximate cause of HRH's loss of the option contract. Accordingly, the fourth element, that a Defendants' intentional and improper interference resulted in—in other words, cause—damage to HRH, is not satisfied.

**Damages**

Finally, even if HRH could establish the Defendants' appeals resulted in HRH's loss of the option contract to purchase the Bar J Property, HRH has failed to prove its damages to a reasonable degree of certainty. HRH claims three categories of damages in this case: (1) the damages incurred by HRH in pursuing its development of the Bar J Property in the amount of $356,931.65, (2) the lost profit damages HRH suffered from its lost opportunity to develop the Bar J Property according to its March 2, 2017 application to amend the Bar J Master Plan in the amount of $21,869,289, and (3) the loss of HRH's option agreement with Mr. Humphrey, which HRH values at $1,300,000 to account for the difference in the

price of the option versus the appraisal value of the land as entitled. (*See* Plaintiff's Proposed Findings of Fact, Conclusions of Law, ECF No. 188 at 34.)

HRH's claimed damages are wholly speculative and unsupported, as they are primarily founded on the assumption that HRH's application would have been approved by the County as it was submitted on March 2, 2017. However, the overwhelming evidence established that the County's approval was highly improbable.

Beginning with the claimed costs of pursuing development in the amount of $356,931.65, these costs were not actually costs incurred by HRH. Mr. Hancock and Mr. Reynolds confirmed as much in their testimony, where they each testified neither member ever contributed any funds to the LLC. Instead, those funds were financed exclusively by private loans on terms in which the lenders understood the inherent risks associated with the entitlement process and agreed to forego repayment unless the project was approved, which it was not. HRH itself—including its members Mr. Reynolds and Mr. Hancock— did not spend any money pursuing the development proposal. Ultimately, HRH failed to show it sustained any damages associated with its failed application.

Next, HRH alleges it has proven, to a reasonable degree of certainty, it lost over $21 million dollars in expected profits from the proposed development. Again, such a finding is fatally flawed because it is based upon the false assumption that the application to amend the Bar J Master Plan would have been approved by the County. "The general rule in Wyoming is that remote, uncertain and conjectural or speculative damages are not allowed." *Chrysler Corp. v. Todorovich*, 580 P.2d 1123, 1134 (Wyo. 1978). This rule extends to lost profits, which require proof that: "(1) net profits were lost; (2) the amount

of those profits can be determined with a reasonable degree of certainty; and (3) the defendant's breach was the proximate cause of the lost profits." *WSP, Inc. v. Wyoming Steel Fabricators & Erectors, Inc.*, 2007 WY 80, ¶ 20, 158 P.3d 651, 655 (Wyo. 2007).

In HRH's case, it cannot meet its burden to prove net profits were lost with a reasonable degree of certainty because the status of its pending application with the County was so uncertain—even without the appeals filed by Defendants. In a tortious interference claim, "lost profits" means the "expected gains from transactions which the injured party expected to complete" had it not been for the tortious interference. *Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 22, 421 P.3d 518, 524 (Wyo. 2018) (citing 22 Am.Jur.2d Damages § 64) (internal quotations omitted). However, HRH cannot establish it ever expected gains from its proposed development because all evidence pointed to the County declining to approve the application. HRH's own land planning expert, Mr. Pierson, acknowledged HRH's application, as it was submitted on March 2, 2017, would not have been approved. HRH expressed no intention to delineate from that application, nor did it demonstrate any efforts to make the significant amendments necessary to gain County approval. Therefore, any damages calculation would be based upon speculation and conjecture, which is insufficient. *See B&P Holdings I, LLC. v. Grand Sasso, Inc.*, 114 F. App'x 461, 466 (3d Cir. 2004) (affirming exclusion of evidence regarding lost profits where "the number of approvals (zoning, planning, environmental, etc.) that would have been required, even if a final agreement had been reached, is daunting"), *see also Sun Val, LLC v. Comm'r of Transp.*, 193 A.3d 1192, 1201, 330 Conn. 316, 330 (Conn. 2018) ("The

plaintiff cannot recover for the mere possibility of making a profit.") (internal citations omitted).

HRH's damages calculation is also predicated on unfounded assumptions regarding the expected costs of the project and project financing. For example, Mr. Hancock and Mr. Reynolds testified that HRH would have received a necessary $75 million construction loan at six percent annual interest from First Interstate Bank. HRH purportedly reached these financing assumptions after discussions with Frank Lyons, Vice President of First Interstate Bank's Jackson, Wyoming office. Yet, Mr. Lyons testified at trial he would never have approved of a loan to HRH if Mr. Hancock was a participant in the project due to Mr. Hancock's history with the bank. Mr. Hancock previously failed to pay back a loan from First Interstate bank, and First Interstate bank had an outstanding judgment against him. (*See* Exs. B-2.) Mr. Lyons testified he only had preliminary conversations with Mr. Reynolds about financing a development project, but that the conversations never amounted to anything. Mr. Lyons also stated First Interstate would not have been interested or able to loan $75 million to HRH to construct its project.

Additionally, Mr. Hancock and Mr. Reynolds testified they planned to receive personal financing from a friend and colleague, Clarke Nelson. However, these statements were not substantiated by any other witness, nor was there documentation to support the statements. Mr. Nelson passed away in 2019. In fact, evidence seemed to conflict with those statements, as Nannette Beckley, one personal investor in HRH's proposed development, was never aware of Clarke Nelson being a potential donor. (*See* Ex. Z-2-1 at 53, 56, 57-59, 77.) In any event, the assumptions concerning funding of the project

proposed by HRH are just as speculative as the project's approval by the County, compounding the uncertainty surrounding the lost profits amount claimed.

Finally, turning to HRH's claimed damages for the cost of the option contract itself, HRH alleges it is entitled to an additional $1.3 million to account for the difference between the final option price of $16,000,000 (*see* Ex. 5.) and the value of the land with its entitlements according to HRH's application, which was determined by an appraisal to be $17,300,000. (*See* Ex. 101.) The valuation of the land was presented by expert appraiser Allison Free, who valued the land "As Entitled" as of the September 30, 2017 option expiration date. (*Id.* at 1. ("The "As Entitled" value is based on a hypothetical condition that the property received approval from Teton County to construct 69 residential units as of the effective date.").) Thus, Ms. Free's valuation suffers from the same fatal defect as the lost profits' valuations presented by experts Mr. Hampton and Mr. Duncan, as the amount depends on HRH's application being approved by the County. Because this Court has already determined that evidence at trial established HRH's application was highly unlikely to have been approved by the County, HRH's damages amount based on the entitled land is flawed due to its reliance on speculative and uncertain events. *See Roden v. State*, 173 P.3d 639, 372 (Wyo. 2002) ("We have said that damages must be susceptible of ascertainment with a reasonable degree of certainty, and that a court may not speculate or engage in conjecture in awarding damages.") (citing *Reiman Construction Company v. Jerry Hiller Company*, 709 P.2d 1271 (Wyo. 1985), *Broyles v. Broyles*, 711 P.2d 1119 (Wyo. 1985)).

HRH's damages are contingent on at least two key events: County approval of its March 2, 2017 application with enough time to exercise the September 30, 2017-expiring option agreement, and a guaranteed ability to obtain the requisite funding of $75,000,000 from various third parties. The evidence failed to show, by a preponderance of the evidence, that either of these events were reasonably or remotely likely to occur. Thus, there is no basis for the speculative assumptions on which HRH's damages claims are predicated. The alleged damages are too hypothetical to sustain an award. *See Giuliano v. Gawrylewski*, 40 Misc.3d 1210(A), 2013 WL 3497611, at *10 (Sup.Ct. N.Y. Cnty. 2013), *aff'd*, 122 A.D.3d 477, 997 N.Y.S.2d 20 (1st Dept 2014) (citing *RNK Capital LLC v. Natsource LLC*, 76 A.D.3d 840, 842 (N.Y. App. Div. 2010) ("dismissing claim for lost profits arising out of alleged breach of fiduciary duty where 'plaintiffs' ability to realize profits from the allegedly usurped investment opportunity was contingent on certain conduct by third parties and authorization from a government-sanctioned oversight entity, both of which were highly uncertain and well beyond the scope of defendants' influence or control'."). Given these uncertainties HRH's claimed damages are purely speculative and fail to satisfy the reasonable degree of certainty required under Wyoming law.

Finally, having found that HRH has failed to prove the elements on its underlying tortious interference claim, its claim for punitive damages is effectively disposed. *See Cook v. Shoshone First Bank*, 126 P.3d 886, 897 (Wyo. 2006).

## CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law this Court finds Plaintiff HRH, LLC has not satisfied his burden of proving, by a preponderance of

the evidence, the elements of a tortious interference claim against Defendants under Wyoming law and Defendants are entitled to a judgment in their favor. *See Downs v. Homax Oil Sales, Inc.*, 2018 WY 71, ¶ 21, 421 P.3d 518, 524 (Wyo. 2018).  Therefore, it is hereby

ORDERED that judgment be entered against Plaintiff HRH, LLC and in favor of Defendants Alliance of Route 390 Neighbors, Gerald J Kitchen, *individually* and as *trustee of the Gerald J Kitchen and Diana Kitchen Family Trust dated July 10, 2007*, and Diana Kitchen, *individually* and as *trustee of the Gerald J Kitchen and Diana Kitchen Family Trust dated July 10, 2007* on Plaintiff's claim for tortious interference.

Dated this 31st day of March, 2022.

Scott W. Skavdahl
United States District Judge